## WILLIAMS v. KIRBY LUMBER CO.†

(Court of Civil Appeals of Texas. March 29, 1911. Rehearing Denied May 4, 1911.)

1. MASTER AND SERVANT (§ 287*)—INJURY TO EMPLOYÉ—JURY QUESTIONS—VICE PRINCIPAL.

In an action for injury to a sawmill employé, held, under the evidence, a jury question whether the sawyer who caused the injury, was a vice principal authorized to control plaintiff.

[Ed. Note.—For other cases, see Master and Servant, Dec. Dig. § 287.*]

2. MASTER AND SERVANT (§ 286*)—INJURY TO EMPLOYÉ—JURY QUESTIONS—DISCOVERED PERIL.

In an action for injury to a sawmill employé, caused by a sawyer's movement of a saw carriage, held, under the evidence, a jury question whether the sawyer discovered plaintiff's peril in time to have prevented the injury in exercising ordinary care.

[Ed. Note.—For other cases, see Master and Servant, Dec. Dig. § 286.*]

3. MASTER AND SERVANT (§ 137*)—DISCOVERED PERIL—DUTY TO EMPLOYÉ.

If a lumber mill sawyer discovered plaintiff employé's peril in time to have avoided injuring him through movement of a saw carriage, he was bound to use ordinary care to use every means in his power, consistent with his own safety and that of other members of the crew, to prevent plaintiff's injury.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 273; Dec. Dig. § 137.*]

4. WITNESSES (§ 395*)—INCONSISTENT STATEMENTS—REBUTTAL BY SHOWING CONSISTENT STATEMENTS.

Plaintiff could not show statements by him out of court, consistent with his testimony, to rebut defendant's evidence of contradictory statements.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. § 1260; Dec. Dig. § 395.*]

Appeal from District Court, Jefferson County; L. B. Hightower, Jr., Judge.

Action by James J. Williams against the Kirby Lumber Company. Judgment for defendant, and plaintiff appeals. Reversed and remanded.

Blain & Howth and M. G. Adams, for appellant. Oliver J. Todd and Andrews, Ball & Streetman, for appellee.

PLEASANTS, C. J. This is a suit by appellant against appellee to recover damages for personal injuries alleged to have been caused by the negligence of appellee.

At the time of his injuries, plaintiff was. working for defendant as block setter on the carriage of the saw in defendant's sawmill at Roganville, Tex. His duties required him to ride the carriage between the two doggers thereon, and by means of a lever to regulate the thickness of the lumber to be sawed in accordance with the orders of the sawyer. The sawyer ran the carriage by operating a lever which controlled the steam used as a motive power, and which regulated the speed of the carriage. The track on which the carriage was operated was about sixty feet long and five or six feet wide. The carriage was operated swiftly back and forth on the track by means of what is known as a "shotgun feed." Steam was used as a motive power. The feeding of the steam into the gun was regulated by means of an upright lever. This lever was located about midway of the carriage track, and two or three feet to one side. To operate the carriage on the track, the sawyer stood, holding this lever, with his face to the carriage. By pulling the lever back and forth, the sawyer would let in as much or as little steam as he wanted, could run the carriage at any speed desired, and could start and stop it, either slowly or suddenly. While the carriage was moving, either forward or backward, at full speed, it could be suddenly stopped and immediately shot in the opposite direction. On the side of the carriage opposite where the sawyer stood while operating his lever was an upright exhaust pipe, situated to the sawyer's left, about a foot from the carriage. This pipe was 10 or 15 feet towards the saw from a point opposite the sawyer's station. About the same distance to the right of the sawyer; and on the opposite side of the track, was what is called the stationary board, which was an upright piece of lumber fixed close to or against the track.

The pleading and evidence of plaintiff showed substantially the following facts: A crooked log was being sawed, and the sawyer, Jim Bailey, for some reason, failed to run the line all the way through the log. He started the carriage back under a full head of steam, as if he intended to go all the way to the back end; but by the time he had brought his carriage back from four to six feet from the front end he discovered that he had not cut the line all the way through, and that a slab was left on the log; whereupon he suddenly reversed the carriage, made an immediate stop, and instantly shot it forward under a full head of steam and finished the line. This sudden stopping of the carriage while on its backward course, and shooting it forward again,. threw plaintiff off his balance. As the car-

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key No. Series & Rep'r Indexes.

† Application for writ of error dismissed by Supreme Court.

riage was shot forward, plaintiff was out of balance, stumbling and falling. While in this falling or overbalanced position, the motion of the carriage brought him in contact with the exhaust pipe, which knocked him down under the carriage, his face down and his left leg hanging off the side of the carriage. While he was in this position, the sawyer reversed the carriage and sent it rapidly toward the rear of the track. By this movement of the carriage, plaintiff's left leg was brought in violent contact with the stationary board, and was so badly broken and mangled as to require its amputation.

Plaintiff alleged that Jim Bailey was the sawyer, and that he was foreman of the carriage crew of which plaintiff was a member, and that he had the power and authority to direct and control, and to hire and discharge, plaintiff and the other members of the carriage crew, and that he was therefore defendant's vice principal. That the defendant was guilty of negligence, in that its vice principal, Jim Bailey, reversed his carriage suddenly and violently while on its backward course, and shot same forward under a full head of steam to complete the cutting of the line. That defendant was further guilty of negligence, in that its vice principal, Jim Bailey, failed and omitted to see plaintiff in his peril, in that plaintiff was thrown down on the carriage at the forward end of the track, and the sawyer thereafter brought the carriage back toward the other end of the track, until plaintiff's leg came in contract with the stationary board. That defendant was guilty of negligence, in that its vice principal, Jim Bailey, saw plaintiff in his peril and failed to use ordinary care to stop the carriage. That the defendant was further negligent in employing and retaining in its employ said Jim Bailey as its sawyer, in that he was incompetent by reason of his irritable, excitable, and nervous temperament.

The defendant's answer contains general and special exceptions, general and special denials, and pleas of assumed risk, contributory negligence, and negligence of a fellow servant. The trial in the court below was with a jury, and resulted in a verdict and judgment in favor of defendant.

The only issue of negligence on the part of the defendant submitted to the jury by the charge of the court was its employing and retaining in its employment an incompetent sawyer when it knew, or by the use of ordinary care must have known, of his incompetence.

[1] Plaintiff requested the court to submit to the jury the question of whether the sawyer, Jim Bailey, was a vice principal of defendant, authorized to direct and control plaintiff in his work and to hire and discharge him, and to instruct the jury that, in event they found that Bailey was such vice principal, and that plaintiff was injured by Bailey's negligence, as alleged in the petition, they should find for plaintiff, unless they found for defendant upon the issue of assumed risk or contributory negligence as submitted in the charge.

[2] Plaintiff also requested the court to submit to the jury the issue of discovered peril, and the negligent failure of Bailey, after he saw that plaintiff had fallen upon the carriage and realized his imminent danger of injury, to use proper care to prevent his injury. Under appropriate assignments of error appellant complains of the refusal of the court to submit these issues to the jury. We think both issues were raised by the evidence, and, both being grounds of recovery alleged in the petition, they should have been submitted to the jury.

Upon the issue of whether the sawyer, Jim Bailey, was a vice principal of defendant the following testimony was adduced: James J. Williams, plaintiff, testified: "Jim Bailey hired me to go to work.. He first spoke to me about going to work there. He told me what they paid. He controlled me there and directed me in doing my work; he was my foreman there. Besides directing the crew and hiring them, Mr. Bailey operated the carriage; he controlled the steam and lever that operated the carriage. I saw him put Withers and Truett off the carriage."

On cross-examination he testified: "I testified on direct examination that Jim Bailey hired me. The mill foreman came around about the time Bailey was changing saws, and Bailey introduced me to him; that is, Mr. Young, I guess Mr. Young can fire anybody in the mill that he wanted to. Bailey told Young, 'This is the fellow that I wrote for,' and Mr. Young said, 'Yes.' I had a recommendation, and Young, the mill foreman, took it. I do not know what conversation Bailey had with the mill foreman, and whether Young told him to write to me. I do not know whether Bailey wrote the letter to me at Young's request or not. Young and I did not have any talk about what they were paying there. Bailey told me that he had been paying $2, but that he would give me $2.25."

Arden Wright testified: "In the Kirby Lumber Company mill at Rogan, Tex., at the time of the injuries to Williams and several months previous thereto, Bailey had exercised the power of discharging members of the carriage crew. Eula Wills was discharged by Bailey. At the time of the injuries to Williams and several months previous thereto, Bailey had exercised the power and authority to hire members of the carriage crew. Jim Williams was hired by Bailey; Eula Wills was hired by Bailey on trial. I have taken men to him for employment, and he said to them that if they were good doggers he would take them, and put them on the carriage. He tried men I took to him. He tried Eula Wills; he put him on the carriage for trial. Bailey did not send this man Jim Young either to hire or discharge

him. All the specific instances I remember of where Bailey either hired or discharged members of the carriage crew are Jim Williams, Nathan Kerr, Eula Wills, and a negro whose name I don't know." .

Thomas Withers testified: "My understanding is that in similar work and under similar circumstances—that is to say, in the sawmills of the Kirby Lumber Company—the sawyer usually has the power and authority to direct and control the work and the method of the work of the carriage crew. As to all of these specific instances within my knowledge, where Bailey discharged members of the carriage crew, or stood them aside and would not let them work on the carriage, there was myself one time and Floyd Rhodes, a negro. Bailey hired William Davis without saying anything to any one; as to whether or not Bailey sent the men to Jim Young, either to hire them or discharge them, I don't know whose job that was; I have seen Bailey do it. He put myself and that Floyd Rhodes off the carriage, and he hired William Davis."

Floyd Rhodes testified: "I worked for the Kirby Lumber Company in February, 1908, and left in June. I worked on the carriage as one of the carriage crew, dogging. I quit work there because I was let out. Jim Bailey discharged me. Jim Bailey was the sawyer at the time I was working for the Kirby Lumber Company at Rogan, Tex."

William Davis testified: "I have been working for the Kirby Lumber Company at Rogan, Tex., about eight or ten months. I have worked on the carriage with Jim Bailey as sawyer. I have worked on the carriage off and on for four months. Jim Bailey put me to work on the carriage. He asked me if I wanted to take the head end of the carriage, and I told him I did. Bailey told me to come back at noon that day and go to work. And I did so. Jim Young said nothing to me about working on the carriage. I am still working for the Kirby Lumber Company as head dogger for the carriage."

Jim Bailey, a witness for defendant, and who was at the time of the trial still in defendant's employ, testified on cross-examination as follows: "If I told one of my men to go to the house, it means for him to get off the carriage. I mean for him to get off the carriage, and go where he wants to. I mean that he cannot work there any more. When I tell him to go to the house, I mean that his connection with the carriage is at an end, working with me. It would be up to the foreman; if he wanted to work the man, he could let me out. I mean that I discharged him working for me, working under me, as the foreman of the carriage crew, in that way. The only way he could put him back on the carriage would be to fire me, or put some one else there, or get my consent to put him there. It would be up to them. The same way they would try to select a man to work on the carriage

crew; if I did not want him, they would have to fire me to get him on there. If I set my head against a man working in the carriage crew, I wouldn't stand for a man working there on the crew that I didn't want on the crew. If they would try to furnish me a man to work on the carriage crew that never worked there before, and I did not like that man because he was incompetent, or for any other reason satisfactory to myself, I would not let him work there. As to whether in that way I practically controlled the hiring and discharging, I couldn't fire; I couldn't write their time out. The foreman was supposed to write their time out. I did not actually pay them their money, because the mill foreman keeps that. I can get rid of that man by sending him to the foreman. If I did not want a man, I told the foreman I did not want him; so it is left to me to select my own man, so I understand. It is left to me to select my own men and to discharge the men that do not suit me, to some extent; if they got a man that I did not want on there at all, I would not have him to work. If I had a man working for me, and did not want him any more, I would send him in to get his time. In the way that I have explained to you, the practical result of it was that I controlled my carriage crew; I select them when I want them; I discharge them; I would send them to the foreman; he can give them a job under the mill. I do not care where else he works, but he cannot work for me any more. I direct and control that crew while they are on the carriage. It is true that while they are on the carriage they are under my direction; while in the performance of their duties they are under my direction and subject to my orders."

Jim Young, defendant's mill foreman, who was at the time of the trial and still is mill foreman of the defendant, testified as follows: "If Bailey did not like the way a man did his work, he would send him to me, and I would give him his time or work him somewhere else; I could work him where I wanted to. I would prefer not to work him with Bailey. As to whether when Bailey sent a man to me that meant that man was discharged, I could use him if I wanted to. I would use him somewhere else; I would prefer not to use him under Bailey. As to whether in that way Bailey had the right to put men off the carriage crew, and that was the way Bailey and I handled that matter, and I meant that Bailey could put a man off the carriage crew. I could work him there if I wanted to. As to whether I knew better than to work a man under Bailey that Bailey did not want, I would rather not."

This testimony shows that Bailey did hire and discharge men who worked under him, and that his acts in this regard were known and acquiesced in by the defendant. These

facts would authorize the jury to find that authority to hire and discharge the carriage crew, of which plaintiff was a member, was vested in Bailey by the defendant, notwithstanding he and defendant's general manager and the foreman of the mill all testified that he had no such authority.

But if it be conceded that the jury must have found from the evidence that no express authority had been delegated to Bailey to hire or discharge the men working under him, still, if the testimony of plaintiff's witnesses as to his frequent exercise of that power, with the knowledge and acquiescence of the defendant, he had the potential authority to hire and discharge his men; and the fact that he exercised this power, subject to the approval of his superior officer, would be immaterial. According to Bailey's testimony, if he became dissatisfied with any member of his crew, he made him get off the carriage. His explanation of what his putting a man off the carriage means is: "I mean that he cannot work there any more. When I tell him to go to the house, I mean that his connection with the carriage is at an end, working for me. It would be up to the foreman; if he wanted to work the man, he could let me out. I mean that I discharge him working for me, working under me, as foreman of the carriage crew, in that way." While Bailey and Young, the foreman of the mill, both testify that final authority to determine whether a workman so discharged by Bailey should remain in defendant's employ was vested in Young, he is not shown to have ever reversed Bailey's decision in such case. Bailey's method of controlling the men under him was not, as contended by appellee, that of a fellow servant in charge of the work, who reports and complains to a superior officer of the delinquencies of his men, and asks that the delinquent be discharged, or refuses longer to work with such delinquent; but, on the contrary, when one of his men displeased him, he discharged him from the work, and such discharge was always acquiesced in by the defendant. That Bailey's exercise in this way of the power to discharge those working under him would give him such influence over his men as would raise him above the station of a fellow servant cannot be doubted. They could not feel free to report and complain of his negligent manner of doing his work, and the reason for the rule which holds the master unaccountable to one servant for the negligence of a fellow servant would not exist in such case. Railway Co. v. Peters, 87 Tex. 222, 27 S. W. 257; Railway Co. v. Hinzie, 82 Tex. 623, 18 S. W. 681; Young v. Hahn, 96 Tex. 99, 70 S. W. 950; Alaska Treadwell Co. v. Whelan, 64 Fed. 462, 12 C. C. A. 225; Zintek v. Stimson Milling Co., 9 Wash. 395, 37 Pac. 340; Criswell v. Pittsburg Ry. Co., 30 W. Va. 798, 6 S. E. 31; Texas & Pacific Coal Co. v. Manning, 34 Tex. Civ. App. 322, 136 S.W.—75

78 S. W. 545; 2 Labatt, Master & Servant, § 523.

[3] The testimony as to the relative positions of Bailey and the appellant at the time appellant fell upon the carriage is such that the jury might have found that Bailey saw appellant fall, notwithstanding he testified that he did not see him, and did not know that he had fallen, upon the carriage until after he received his injuries. If he saw appellant fall, he must have realized his peril, and it was his duty, in the exercise of ordinary care, to use every means in his power, consistent with his own safety and that of the other members of the crew, to prevent appellant's injury. The evidence shows that the carriage could have been stopped almost instantly, and if Bailey saw appellant fall he could have stopped it in time to have avoided the injury. The evidence called for the submission of the issue of discovered peril. Brown v. Griffin, 71 Tex. 659, 9 S. W. 546.

[4] Upon the trial, the defendant introduced the testimony of several witnesses who testified that the plaintiff, while he was in the hospital for treatment for the injuries for which he brings this suit, and on several occasions after he left the hospital and before this suit was brought, made statements as to the cause of his injuries contradictory to the statements made in his testimony on the trial of this case. In rebuttal of this testimony, the plaintiff offered the testimony of several witnesses to the effect that, after he left the hospital and before the suit was brought, he made statements to said witnesses as to the circumstances and cause of his injury similar in all respects to the statements made in his testimony upon the trial. This testimony was excluded by the court, on the ground that the statements of plaintiff to said witnesses was self-serving, and therefore inadmissible in evidence.

We do not think the court erred in this ruling. Under the rule laid down by our Supreme Court, in the case of Insurance Company v. Eastman, 95 Tex. 34, 64 S. W. 863, the test of the admissibility of hearsay evidence of this character is whether, at the time the offered declarations were made, there existed any motive which would likely influence or color the statements of the declarant, and unless it appears that no such motive existed the declarations are inadmissible. Applying this rule to the facts of this case, it cannot be said that no motive existed which could have induced plaintiff to make statements of the circumstances under which he received his injuries, showing that such injuries were caused by the negligence of the defendant. Unless the injuries were so caused, plaintiff was entitled to no compensation therefor. It is not shown that he at that time contemplated bringing this suit; but there is nothing to rebut the natural inference that the suit which was brought a short time thereafter

was then in contemplation, and the motive to fix a liability upon the defendant to compensate him for his injuries was, so far as the record shows, just as strong at that time, as when plaintiff testified on the trial. Upon the authority of the case cited, the assignment complaining of this ruling of the court is overruled.

It would serve no useful purpose to discuss the various assignments in detail. None of the remaining assignments presents any material error, or any error that is likely to occur upon another trial.

For the reasons indicated, the judgment of the court below is reversed, and the cause remanded.

Reversed and remanded.